842 A.2d 359

Darlene E. BEHERS

v.

UNEMPLOYMENT COMPENSATION BOARD OF REVIEW.

Appeal of St. Paul's Manor.

Doreen L. Gainer

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Wesley E. Brooks

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Adrian L. Szymczak

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Carrie A. Burfield

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Angela M. Szymczak

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Shirley M. Schneider

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Susan Rethage

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Patricia A. Rethage

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Lisa Najphor

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Keran Psuty

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

John M. O'Neill

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Linda S. Newman

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Lillian N. Butler

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Marcella E. Hanechak

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Scott A. Franz

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Richard L. Mierun

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Patricia I. Kuhlman

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Rosemary P. Kihn

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Emilie Jozwiak

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Rene Glover

v.

Unemployment Compensation Board of Review.

Appeal of St. Paul's Manor.

Supreme Court of Pennsylvania.

Argued March 4, 2002.

Decided Feb. 17, 2004.

58

Jesse H. Sweet, Richard V. Sica, Joseph Mack, Pittsburgh, for St. Paul's Manor.

Judith Marie Gilroy, Clifford Blaze, Harrisburg, for Unemployment Compensation Bd. of Review.

D. Michael Fisher, Harrisburg, for Atty. Gen.

Alan C. Blanco, Stephen H. Jordan, Pittsburgh, for Darlene E. Behers.

John T. Kupchinsky, Irwin William Aronson, Camp Hill, for appellee amicus curiae, AFL-CIO.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

### OPINION

JUSTICE CASTILLE.

The issue raised in this appeal is whether the Commonwealth Court was correct in looking beyond the terms of a collective bargaining agreement (the CBA) to determine what conduct constitutes a disruption of status quo in an unemployment compensation case. Today, we reaffirm our holding in *Miceli v. Unemployment Compensation Board of Review (Quaker Oats Co.)*, 519 Pa. 515, 549 A.2d 113 (1988), that a court may not look beyond the terms and conditions of employment, as embodied in the CBA, in order to make such a determination. Accordingly, we reverse the order of the Commonwealth Court and reinstate the order of the Unemployment Compensation Board of Review (the Board).

Appellant St. Paul's Manor operated a personal care facility for the elderly in Pittsburgh. The United Food and Commercial Workers of America, Local 23 organized and represented the full-time and part-time non-professional employees of St. Paul's, including each of the twenty-one appellees herein. On behalf of those employees, the union negotiated with appellant and formally executed a CBA governing the terms of appellees' employment. The CBA took effect in March of 1995 and was to expire in March of 1998. One month before expiration of the CBA, appellant and the union began negotiating the terms of a new work agreement. To provide for the interim

period between the expiration of the original CBA and the effectuation of a new agreement, the parties entered into an extension agreement whereby they agreed to operate under the terms and conditions of the original CBA until either party provided a ten-day notice of contract termination.

Several portions of the original CBA are at issue. First, the CBA provides that an employee who suffered a work-related injury is eligible for "light duty" work, with appellant retaining the sole discretion to assign light-duty-eligible employees to any "job classification."[1] In addition, the CBA gives appellant the right to make individual shift assignments and gives employees the right to select shifts in order of seniority.[2]

Prior to April of 1998, employees who were placed on light-duty status were permitted by appellant to maintain their regular shift hours. However, in April of 1998, during the extension period, appellant announced a new policy wherein light-duty employees were obliged to choose between one of only two work shifts—the 10:30 a.m. to 6:30 p.m. shift, or the 3:00 p.m. to 11:00 p.m. shift. Two light-duty employees were affected by the new policy, and appellant offered a shift preference to the senior of the two employees. The senior employee chose the day-time shift, forcing the other employee to have to resign her light-duty position because the later shift conflicted with her childcare arrangements.[3]

1. Section 19.2 of the CBA states:
   When an employee has a work-related injury, said employee shall be eligible for "light duty" work in the facility. [Employer] has the option in its sole discretion, to assign employees on job-related disability to "light duty" work in any job classification, so long as the work is permissible by the employee's or employer's physician and will not result in loss of hours to any other full time employee.

2. Section 3.2 states, in relevant part:
   [Employer] shall ... have the right to ... make individual shift assignments, establish and change schedules, workdays, and starting and quitting times....
   Section 8.3 states, in relevant part:
   The Employer has the right to set starting times. Employees shall have the right to shift preference in accordance with Article 7.4 [governing filling of vacancies by seniority].

3. Neither of the two light-duty employees affected by this change in policy is a party to the instant matter.

On April 21, 1998, the Union filed a grievance on behalf of the employee who was forced to resign. Appellant denied the grievance but maintained that the employee could again choose her shift hours once she was restored to full-duty status.

In the meantime, negotiations for the new CBA had deteriorated. On April 15, 1998, appellant submitted its last, best offer, which the union rejected. On April 27, 1998, the union notified appellant that, as of May 10, 1998, it would terminate the extension. On May 11, 1998, appellees initiated a work stoppage and set up picket lines at appellant's facility.

Thereafter, the twenty-one appellees herein each applied individually for unemployment compensation benefits, pursuant to the Unemployment Compensation Law (UCL), 43 Pa. C.S. § 751, *et seq.* The Office of Employment Security denied their claims by Notices of Termination dated July 22, 1998. Each appellee appealed, and their petitions were consolidated for hearing before a referee. On September 4, 1998, the referee issued a decision concluding that the work stoppage was a "strike" rather than a "lock-out" and, thus, affirmed the denial of benefits. The referee reasoned that a work stoppage would constitute a lock-out, and thereby qualify the employees for unemployment compensation benefits, only if "the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage [and] ... the Employer refused to ... extend the expiring contract and maintain the status quo...." Referee's Decision at 4 (citing *Erie Forge and Steel Corp. v. Unemployment Compensation Board of Review (Appeal of Vrotney)*, 400 Pa. 440, 163 A.2d 91, 93–94 (1960)). Finding that appellant had not refused to extend the expiring contract in order to maintain the status quo, the referee determined that the work stoppage was a strike rather than a lock-out. The referee concluded that Section 402(d) of the UCL, which makes an employee ineligible for unemployment compensation where unemployment is due to a work stoppage resulting from a "labor dispute (other than a lock-out)," barred appellees

from receiving benefits.[4]  Appellees appealed, and the Board affirmed without an opinion.

Upon further appeal, the Commonwealth Court reversed in a Memorandum Opinion.  The panel recognized that "the *Vrotney* test requires a determination as to which side 'first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.'"  Op. at 103, 242 A.2d at 455 (quoting *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454, 455 (1968)).  The panel further noted that "status quo" is defined as "the last actual, peaceable and lawful, noncontested status which preceded the controversy." Op. at 544, 454 A.2d at 520. (quoting *Fairview School District v. Unemployment Compensation Board of Review*, 499 Pa. 539, 454 A.2d 517, 520 (1982)).  The panel then cited to this Court's decision in *Miceli*, 519 Pa. 515, 549 A.2d 113, stating:

> Our decision today is consistent with *Miceli v. Unemployment Compensation Board of Review*, 519 Pa. 515, 549 A.2d 113 (1988), where our Supreme Court reversed our decision, which had indicated that the status quo did not include the previous conduct of the parties.... The *Miceli* Court stated:
>
>> Furthermore, condoning a rule that would require the courts to consider factors other than the previous terms and conditions of employment would only complicate the issue and is contrary to our policy to keep the standards regarding disruption of the status quo easy to apply on the administrative level ... The status quo consists of the previous terms of employment, nothing more, nothing less.

4.  Section 402(d) of the UCL states, in relevant part:
   An employe shall be ineligible for compensation for any week—

   . . .

   (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed[.]
   43 P.S. § 802(d).

*Id.* at 118 n. 3. Therefore, neither the Court in *Vrotney,* nor the Court in *Miceli,* have limited the status quo to only the terms and conditions of the expired agreement, but have specifically indicated that the status quo consists of the "terms and conditions of employment."

Op. at 118, 549 A.2d at 526. The panel expressly interpreted *Miceli* to mean that the term "status quo" encompasses not only the terms of the written CBA, but also "past practices" of one or both parties. The court concluded that, because it had been the past practice of appellant-employer to allow light-duty-status employees to maintain their previous shift hours, the change in that policy represented a disruption of the status quo for purposes of determining eligibility for unemployment compensation.

In reviewing an appeal from the adjudication of a Commonwealth agency, we must affirm unless: (1) the adjudication violated the appellant's constitutional rights; (2) the adjudication was contrary to law; (3) an agency procedure was violated; or (4) a finding of fact necessary to the decision is not supported by substantial evidence. *See Miceli,* 549 A.2d at 115. Here, appellant claims that the Commonwealth Court committed an error of law; our review of such a claim is plenary.

In unemployment compensation cases involving a work stoppage, the party that takes action to effectuate the stoppage bears the burden to prove that the other party, in fact, first disrupted the status quo. *See id.* at 116. Thus, as we clarified in *Miceli:* "[w]here the Union membership votes to withhold services and the work stoppage is in the nature of a strike, claimants have the burden of showing that it was the employer who first refused to continue under the status quo." *Id.* Conversely, if the employer locks out its employees, as occurred in *Miceli,* the employer bears the burden of proving that it was the claimants who first disrupted the status quo. *Id.* The party bearing the burden must prove its case by substantial evidence. *Id.* Here, the union notified appellant of its intent to end the extension agreement, initiated the work

stoppage, and established picket lines. Accordingly, appellees bore the burden of proving, by substantial evidence, that appellant had disrupted the status quo, thereby precipitating the work stoppage and entitling them to unemployment compensation benefits. We now turn to whether appellees met that burden.

In *Miceli,* employer Quaker Oats Company had entered into two separate CBAs with its employees' union, which together covered approximately 375 hourly-wage employees at the employer's production and distribution facilities. One of the agreements was due to expire on March 31, 1979 and the other on April 1, 1979. Approximately one month before expiration of the CBAs, the employer and the union began negotiations for a new work agreement. Unable to reach a new agreement before the old ones expired, the parties signed a "memorandum agreement providing that the plant would remain open and the parties would continue to work under the terms and conditions of the expired agreements while negotiations continued." 549 A.2d at 114. The extension agreement further stated that the union would not strike and the employer would not lock out the employees without twenty-four hours written notice. During the course of the parties' negotiations toward a new agreement, the employer expressed concern over what it considered a work slowdown by the employees' refusal to accept overtime work and over allegations of equipment and plant sabotage by the employees. Thereafter, the employer gave written notice to the union that all union employees would be locked out on April 28 and subsequently rejected the union's offer to continue working under the extension.

Following the lock-out, the claimants sought unemployment compensation benefits, which were approved by the Office of Employment Security. The employer appealed and a referee affirmed. Upon further appeal, the Board affirmed. The employer then appealed to the Commonwealth Court, which reversed and remanded to the referee for findings of fact. Following the remand, the Board vacated its previous order and held that the claimants had first altered the status quo by

refusing to perform overtime work and by causing instances of sabotage to the employer's equipment. Accordingly, the claimants were denied benefits. The Commonwealth Court affirmed.

On further appeal to the Supreme Court, this Court found that, because the work stoppage took the form of a lockout, the burden to demonstrate a disruption of the status quo rested with the employer. In considering whether the employer had met its burden, the Court examined the claimants' conduct asserted by employer to have constituted a strike: the "slowdown," the alleged sabotage, and the refusal to work overtime. Noting that the record was devoid of any evidence of specific acts of sabotage and that the Board had never made a finding of a concerted "slowdown," the Court rejected the employer's claim that the alleged conduct caused a disruption of the status quo, effectively constituting a strike. In addition, the Court rejected the employer's claim that the claimants' refusal to accept overtime work from the employer constituted a disruption of the status quo, explaining that the terms of the CBAs governed what factual situation might be deemed the status quo:

> [T]he evidence must establish that under the status quo, refusal of overtime work was not permitted. In other words, it must be shown that required overtime work was part of the pre-existing terms and conditions of employment under the expired bargaining agreements. Clearly, this is not the case. The expired agreements provide for voluntary overtime work which the individual employees were free to accept or decline. The fact that during the month of April, 1979, more of the employees than usual exercised their right to refuse overtime work does not establish an alteration of the status quo on the part of the claimants.... The Commonwealth Court, in affirming the Board's finding that the claimants altered the status quo by refusing overtime work, concluded that the status quo consisted not only of the terms and conditions of employment under the expired agreements, but also of the previous conduct of the parties. Our opinions in *Vrotney* and *Philco* limited the status quo to

the pre-existing terms and conditions of employment which, as here, are embodied in the expired agreement. The Commonwealth Court's departure from this relatively clear and simple rule was error.

*Id.* at 118.[5]   Thus, this Court reversed the Commonwealth Court and reinstated the order of the referee granting unemployment benefits.

The foregoing language of *Miceli* makes resolution of this appeal relatively straightforward. The Commonwealth Court, however, looked beyond the CBA and expressly considered the past conduct and/or practices of the parties in determining the status quo at the time of the work stoppage. The panel concluded that: "Employer arbitrarily altered the work schedules of these employees, thereby disregarding its past practice. We conclude that this was a change to the status quo." Op. at 118–19, 549 A.2d at 526–27. As support for its focus on "past practices," the panel looked not to the clear holding of *Miceli,* but to the language in footnote three in that case, where this Court stated that: "[t]he status quo consists of the previous terms and conditions of employment, nothing more, nothing less." 549 A.2d at 118 n. 3. While the footnote, if read in isolation, may fail to specify exactly what can be considered in defining the "previous terms and conditions of employment," a reading of the entire majority opinion in *Miceli* leaves no doubt as to the holding of that case: the status quo consists of the previous terms and conditions of employment, **as embodied in the original collective bargaining agreement.** Nothing in footnote three of *Miceli* expressly or impliedly suggests that it was intended to limit the rule articulated at some length in text. The Commonwealth Court erred in interpreting *Miceli* to permit the consideration of

5. In *Philco,* 430 Pa. 101, 242 A.2d 454, this Court reasoned that:

Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.

*Id.* at 455.

"past practices" beyond the express terms of the parties' CBA in determining what constitutes the status quo. Indeed, to consider "past practices" not memorialized in the parties' written agreement would eviscerate the clear and simple rule articulated in *Miceli*. We caution the courts below that their task is to effectuate the decisional law of this Court, not to restrict it through curtailed readings of controlling authority.

Under the explicit language contained in the instant CBA, appellant was entitled to: (1) set starting and quitting times for its employees; (2) make individual shift assignments; and (3) establish and change schedules. Despite appellant's past practice of allowing light-duty employees to choose to retain their regular shift hours, the parties' agreement made clear that it was appellant, and not appellees, who reserved the authority to make individual shift assignments and to alter employee scheduling. When appellant exercised that right in April, 1998, it did not disrupt the status quo as defined by the bargaining agreement. Accordingly, when appellees participated in the subsequent work stoppage and set up picket lines, it was they, and not appellant, who disrupted the status quo. Thus, appellees, who initiated the work stoppage, failed to carry their burden, and the Board properly determined that appellees are correspondingly ineligible for unemployment compensation benefits under Section 402(d) of the UCL.

Our decision today, reaffirming the holding and rationale of *Miceli*, is a reminder that the proper inquiry in a case such as that *sub judice* is whether the status quo has been disrupted, and if so, by whom. That inquiry necessarily turns on a determination of what constitutes the status quo, a question we answered in *Miceli* by focusing on the terms of the CBA. We now reaffirm *Miceli*.[6] The order of the Commonwealth

---

6. This Court also granted allocatur on the related but distinct question of whether employees are eligible for unemployment compensation benefits when they engage in a work stoppage without first exhausting the grievance procedure under the existing CBA. There appears to be conflicting decisional law in the Commonwealth Court and the Superior Court on this question. *Compare Grandinetti v. Unemployment Compensation Board of Review,* 87 Pa.Cmwlth. 133, 486 A.2d 1040 (1985) (filing grievance is not condition precedent to union's claim of

Court is reversed and the order of the Unemployment Compensation Board of Review affirming the referee's order, which denied appellees' claim for benefits, is reinstated. Jurisdiction relinquished.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

lock-out during interim bargaining period) *with Westinghouse Electric Corp. v. Unemployment Compensation Board of Review,* 187 Pa.Super. 391, 144 A.2d 673 (1958) (employees who cease work because of alleged breach of CBA are not entitled to unemployment compensation where CBA provides grievance procedure for such disputes). Because we hold today that the employees here, and not the employer, disrupted the status quo by initiating the work stoppage in the form of a strike, we need not reach the question of whether employees are required to follow a CBA-mandated grievance procedure in order to be entitled to unemployment benefits in the event of a lock-out.