# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| ATI Flat Rolled Products LLC, | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | Nos. 226-230 C.D. 2024 |
| | : | & |
| Unemployment Compensation | : | 232-252 C.D. 2024 |
| Board of Review, | : | |
| Respondent | : | |
| | | |
| Allegheny Technologies Incorporated, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No.  231 C.D. 2024 |
| | : | |
| Unemployment Compensation | : | |
| Board of Review, | : | |
| Respondent | : | Argued: February 4, 2025 |


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE STACY WALLACE, Judge (P.)
HONORABLE MATTHEW S. WOLF, Judge


OPINION BY JUDGE WOLF                         FILED:  March 6, 2025


These 27 consolidated matters present a single question:  whether a work stoppage that began as a strike was converted into a lockout by the action of the employer, thus rendering the striking employees not ineligible for unemployment compensation (UC) benefits under Section 402(d) of the UC Law.[1]  Employer ATI

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d).

Flat Rolled Products LLC (ATI)[2] challenges 27 substantially similar decisions of the UC Board of Review (Board) mailed February 1, 2024, affecting requests for UC benefits made by the claimants in these matters (Claimants).[3] Claimants are represented by various locals of the United Steelworkers (Union or USW) under a Collective Bargaining Agreement (CBA) between the Union and ATI. Claimants requested UC benefits while out of work due to a strike the Union initiated after the CBA's term expired. During the strike, several Claimants requested loans against their ATI-sponsored retirement savings accounts, as permitted in the CBA and associated agreements. ATI denied those requests, citing past practice and procedure. We conclude that the Board correctly determined that ATI changed the status quo, thus converting the strike into a lockout and making Claimants eligible for UC benefits. We thus affirm the Board's decisions granting benefits.

ATI operates industrial facilities in western Pennsylvania at which Claimants were or are employed as steelworkers. On behalf of Claimants and other employees, the Union negotiated and entered into several related labor contracts with ATI, which together form the CBA. The present version of the CBA was initially in force from March 1, 2016, through February 29, 2020. The Union and ATI extended the term of the CBA through February 28, 2021. When the CBA's term expired at the end of February 2021, the Union and ATI agreed that employees

---

[2] We use ATI to refer to both the LLC and Allegheny Technologies, Inc., a related entity that employs some of the Claimants in this matter.

[3] Six particular Claimants participated below as representatives of all Claimants at particular work locations of ATI. The representative Claimants are Randy Denman (USW Local 7139, No. 229 C.D. 2024); Lance Jablonski (USW Local 1196, No. 234 C.D. 2024); John Provenzano (USW Local 1138-1, Nos. 240-241 C.D. 2024); Brenda Moran (USW Local 1138, No. 249 C.D. 2024); Keith Beavers (USW Local 1138, Nos. 250-251 C.D. 2024); and Randall Freiss (USW Local 1217, Nos. 230-231 C.D. 2024).

would continue working under the same terms and conditions while they attempted to negotiate a successor CBA.

However, on March 26, 2021, the Union gave ATI notice of its intent to terminate the extension of the CBA and commence a strike at 7:00 a.m. on March 30, 2021. The stated reason for the strike was that negotiations for a new CBA had failed. ATI responded that it would maintain the status quo and current terms and conditions of employment if the strike occurred. The strike began as scheduled on March 30, 2021, and Claimants and all ATI employees covered by the CBA ceased work.

In April 2021, while on strike, multiple Union members requested loans against their 401(k) retirement accounts sponsored by ATI, which the relevant 401(k) plan (Plan) generally authorizes, as is stated in the Plan document referred to in the CBA (Plan Document). ATI denied the requests for loans. On April 22, 2021, a Union representative contacted ATI's Director of Human Resources to request a copy of ATI's Plan documents, and alleged that some requests for loans had been wrongfully denied. ATI's personnel provided the requested documents but also explained that they did not address loan eligibility because that was a matter of administrative discretion, and ATI typically does not offer 401(k) loans to employees who are on unpaid leave. The Union and ATI continued to correspond regarding Claimants' eligibility for 401(k) loans but did not resolve the dispute.

On July 13, 2021, the Union ratified a new labor agreement, including a negotiated return to work. Claimants returned to work beginning July 19, 2021, with all Claimants who intended to return[4] having done so by July 26, 2021.

---

[4] Some Claimants chose to quit their positions during the strike and thus did not return to work when the strike ended. *See, e.g.*, Certified Record (C.R.) at 349 (Board Decision regarding **(Footnote continued on next page…)**

During the strike, Claimants had applied for UC benefits pursuant to the UC Law. In Notices of Determination issued November 19, 2021, the Department of Labor and Industry denied all Claimants UC benefits, reasoning that they were on strike and thus ineligible for benefits under Section 402(d) of the UC Law[5] for weeks ending April 3, 2021, through July 31, 2021. All Claimants appealed that determination.

UC Referee Anthony Kopetsky held a consolidated hearing on the appeals on July 11-12, 2022. The Referee initially admitted various documents into the record, including the expired CBA and the Plan Document. C.R. at 1245-46. Section 18.01 of the CBA references the Plan Document, stating that "[p]ension benefits are currently provided for pursuant to a separate agreement between [ATI] and the Union." *Id.* at 1315. Section 7.6 of the Plan Document makes employees eligible for Plan loans and sets forth certain conditions on those loans.[6] *See*

---

Claimant Michael Sawhook, noting that Mr. Sawhook "permanently quit his position on . . . June 30, 2021," and finding him ineligible for UC benefits for that reason from July 3, 2021, onward).

[5] Section 402(d) of the Law makes an employee "ineligible for compensation in any week . . . [i]n which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out)." 43 P.S. § 802(d).

[6] Section 7.6 of the Plan Document provides, in relevant part:

Loans.

> (a) A Participant who is employed by [ATI] may apply for a loan in accordance with Plan procedures from the Participant's Account. . . . Loans may be subject to a loan initiation fee.

> (b) Each loan shall be in an initial principal amount of no less than $500. In no event shall a loan exceed the lesser of one-half of a Participant's Account Balance in his or her Accounts or $50,000.

**(Footnote continued on next page…)**

4

*generally* C.R. at 1381-1420 (Plan Document).  Article IX of the Plan Document

contemplates a "Plan Administrator" who has "all powers necessary to effect the

terms of the Plan" and "complete discretionary authority to construe, interpret and

apply all of the terms of the Plan, including all matters relating to eligibility . . . and

any dispute of allegedly doubtful terms."  *Id.* at 1413.  The parties also introduced

the summary plan description ATI provides to its employees.  *See* C.R. at 1353-79.

---

(c) A loan shall be secured by the Account Balance in the Plan, which security shall give the Trustee a first lien in such entire Account Balance (including all amounts that become part of such Account Balance before the loan is repaid) to the extent of the entire outstanding amount of such loan, unpaid interest thereon, and all costs of collection.

(d) In the event of a default on the loan, any balance due on the loan shall immediately be due and payable and shall be repaid out of the Participant's Account Balance, and his or her Account Balance shall be reduced accordingly; provided, however, that no recourse shall be available against his or her Account in the event of a default until distribution of such Account is permitted by law.

(e) A Participant may apply for either of two types of loan, a general purpose loan or a residential loan. General purpose loans must be repaid ratably over a period not less than six months and not more than 60 months, and residential loans must be repaid ratably over a period not less than 61 months and not more than 180 months. The amortization and interest rates shall be set by the Administrator in accordance with [(the Employment Retirement Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829, as amended, 29 U.S.C. § 1002[-1461] (ERISA)] and prevailing commercial conditions but shall in no event be less favorable to Participants than comparable loans made to salaried employees under other qualified Plans of the Employer.

(f) A Participant may have no more than three loans outstanding.

(g) A Participant who has separated from service may make arrangements through the Administrator to continue to repay his or her loan.

(h) A Participant may make partial loan payoffs.

C.R. at 1404.

5

The summary states: "If you are an active employee and you have a Plan account of at least $1,000, you may take out a loan. Employees who have retired or [were] terminated are not eligible to request a loan since repayment is through payroll deductions." *Id.* at 1372. The summary is not controlling, and to the extent there is any conflict with the Plan Document, the latter prevails. *Id.* at 1252.

Four of the six representative Claimants were present at the hearing, and they presented the testimony of Rachael Davis, the Union employee who had communicated with ATI regarding the Plan Document. Ms. Davis explained that ATI's 401(k) Plan is a tax-sheltered savings plan where the employee can save their money, to which ATI contributes in some cases. C.R. at 1249. She stated that individual steelworkers who have 401(k) accounts are participants in the Plan and remain employees of ATI even when they are on strike or on a work stoppage. *Id.* at 1251-52. She described her email exchange with Terry Brown, noting Mr. Brown stated that ATI treats employees on unpaid leave as ineligible for loans against their Plan accounts. *Id.* at 1251. Ms. Davis pointed out—and the emails introduced into evidence confirm—that Mr. Brown conceded that the Plan Document itself does not contain any restriction limiting loan eligibility to those in paid status. *Id.*; *see id.* at 1421-23. Ms. Davis explained that ERISA requires there to be a written document controlling the Plan. *Id.*

On cross-examination, Ms. Davis admitted that she was not aware of any cases where ATI has deviated from its practice of denying new Plan loans to employees on unpaid status, and that she had no knowledge how many employees had been denied Plan loans. *Id.* at 1254-55.

Employer presented, among other witnesses,[7] the testimony of Terrance

---

[7] Employers' remaining witnesses testified regarding issues unrelated to those which ATI challenges on appeal.

Brown, Senior Director of Human Resources for ATI, who also serves as ATI's Plan Administrator. Mr. Brown testified that there had never been a time when employees on unpaid status of any kind were allowed to initiate a loan against their 401(k) account. C.R. 1270, 1272, 1273. He stated that the reason for this was that loans were paid back by automatic payroll deduction, and if there was no pay, the loan would not be repaid. *Id.* at 1270-71. In support, Mr. Brown stated that the "Plan procedures" referenced in Section 7.6(a) of the Plan Document do not allow for a new loan to be initiated by an employee in unpaid status. *Id.* He testified that these procedures were directions from ATI to a third party who administers the Plan. But he conceded that there are no written "Plan procedures" that are available to employees, "just sort of a working document between [] ATI and [the] third party." *Id.* at 1272. On cross-examination, Mr. Brown clarified that under the pre-2016 CBA and Plan, ATI applied the same practice of denying Plan loans for unpaid employees.

On October 14, 2022, the Referee issued a series of decisions, including ten representative decisions addressing ineligibility under Section 402(d) at separate work locations, six individual decisions relating to Claimants who were on disability leave at the time the strike commenced and joined it later, and seven individual decisions relating to Claimants who voluntarily resigned employment during the strike. In all decisions, the Referee found that the employees were not locked out of the workplace by ATI, and he denied benefits pursuant to Section 402(d) of the UC Law. The Referee specifically reasoned that ATI's longstanding practice had been to deny loans for employees in unpaid status, such that ATI did not convert the strike into a lockout by continuing to follow that practice for Claimants. *See, e.g.*, C.R. at 13-16. Claimants appealed to the Board.

7

The Board initially issued decisions in six of the appeals affirming the Referee's decision on August 28, 2023. However, on October 6, 2023, the Board vacated those affirmances and thereafter, on February 1, 2024, the Board issued final orders in each of these claims reversing the Referee's decisions. The Board concluded that, on or about April 22, 2021, the strike was converted to a lockout by ATI's unilateral action related to 401(k) loans, and Claimants were thus not ineligible for benefits under Section 402(d). The Board made its own credibility determinations in support of that decision and reasoned, in relevant part, as follows:

> Section 7.6 of the Plan Document contains various enumerated restrictions regarding who is eligible for a loan. None of these enumerated restrictions state that employees on an unpaid leave are ineligible for a loan. While [ATI] may have previously denied loans to Participants on unpaid leave based upon its interpretation of the Plan Document, this amounts to no more than a past practice which is not an express term of the expired CBA. Therefore, it is not relevant in determining the status quo.

> Even though its language is not controlling given the existence of the Plan Document, in the Plan Summary that [ATI] provided to Participants for informational purposes only, it states that "[i]f you are an active employee and you have a Plan account of at least $1,000, you may take out a loan." It only mentions employees who have retired or were terminated as being ineligible to request a loan and says nothing about employees on an unpaid leave.

> [ATI's witness Mr. Brown] testified that "Plan procedures" referenced in Section 7.6(a) of the Plan Document refers to administrative procedures that were established with a third party that administers the [P]lan on [ATI's] behalf, and that those procedures do not allow for new loans to Participants on unpaid leave. When asked if these procedures were written down anywhere, [ATI's] witness testified[:] "Nothing that would be available to participants. Just sort of a working document between

8

employer, ATI, and the third party." [ATI], however, did not provide a copy of this working document to the Union, and did not submit a copy into evidence.

To the extent that the contents of a third-party agreement that was never made available to the Union and was not offered into evidence by [ATI], is relevant in determining the express terms in the expired CBA, the Board does not find credible the testimony of [Mr. Brown] that the express terms in that document do not allow for new loans to Participants on unpaid leave. Therefore, in reviewing the express terms of the expired CBA and the Plan Document, the Board concludes that [ATI] altered the status quo when it refused to grant loans to striking Union members from their 401(k) accounts in contravention of the express terms of the Plan Document.

C.R. at 29. This appeal followed.

On appeal,[8] ATI raises two issues. It first argues that the Board erred in concluding that ATI disrupted the status quo by continuing the practice of denying Plan loans to employees in unpaid status. In ATI's view, no action by ATI converted the strike into a lockout, so Claimants are ineligible under Section 402(d). Second, though ATI concedes that the Board is the ultimate finder of fact, it claims the Board erred in not crediting Mr. Brown's testimony regarding Plan procedures because no substantial evidence supported that credibility determination.

Under Section 402(d) of the UC Law, eligibility for benefits turns on whether a work stoppage resulted from a lockout, or instead from some other labor dispute (such as a strike). To make that distinction, we apply the following test announced by our Supreme Court in *Erie Forge & Steel Corp. (Vrotney) v. Unemployment Compensation Board of Review*, 163 A.2d 91 (Pa. 1960): "Have the

---

[8] When reviewing decisions of the Board, we determine whether constitutional rights were violated, whether an error of law was committed, and whether necessary findings of fact are supported by substantial evidence. 2 Pa. C.S. § 704.

employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations?" *Id.* at 93. And "has the employer agreed to permit work to continue . . . under the pre-existing terms and conditions?" *Id.* If the employer does not so offer, it will have failed to "maintain the status quo," and "the resulting work stoppage constitutes a 'lockout'" which does not disqualify the employees from receiving UC benefits. *Id.* at 93-94.

Under that test, the "status quo" is "the last actual, peaceable and lawful, non-contested status which preceded the controversy." *Miceli v. Unemployment Comp. Bd. of Rev.*, 549 A.2d 113, 116 (Pa. 1988) (quoting *Fairview Sch. Dist. v. Unemployment Comp. Bd. of Rev.,* 454 A.2d 517, 520 (Pa. 1982)). But our Supreme Court has limited the scope of what we and the Board can consider when defining the status quo: we look only to "the pre-existing terms and conditions of employment which . . . are embodied in the expired agreement," and we may not consider "the previous conduct of the parties." *Id.* at 118. We would "err[] in interpreting *Miceli* to permit the consideration of 'past practices' beyond the express terms of the parties' CBA in determining what constitutes the status quo." *Behers v. Unemployment Comp. Bd. of Rev.*, 842 A.2d 359 (Pa. 2004). This "clear and simple rule" is intended to promote speedy and efficient administrative resolution of UC benefits disputes. *Id.*; *see Greer v. Unemployment Comp. Bd. of Rev.*, 4 A.3d 733, 740 (Pa. Cmwlth. 2010).

Employer argues that the Board overread the rule announced in *Miceli* and *Behers*, and it would distinguish those holdings as being limited to instances where the past practice is inconsistent with the labor agreement, not merely absent from it. Here, Employer claims that the past practice—denying Plan loans to

10

employees who are in an unpaid status—was not inconsistent with the CBA because the Plan Document states that Plan loans are to be made under the plan procedures, and the restriction was an established procedure. Employer adds that, when read as a whole, the Plan Document does not guarantee Plan loans to all employees. Employer also emphasizes the Plan Administrator's "complete discretionary authority" to administer the Plan. C.R. at 1413. In response, the Board notes neither the CBA nor the Plan Document expressly establish any limit on Plan loans related to unpaid status. The Board thus argues that to recognize such a limit as part of the status quo would run afoul of the clear rule *Behers* emphasized. Claimants make that same argument, and add that the Plan Document explicitly states that Plan loans are secured by the Plan account balance, not an income stream, which means that the rationale Mr. Brown expressed for denying loans to unpaid employees is inconsistent with the express terms of the Plan Document and, by extension, the CBA.

We agree with the Board and Claimants that this matter falls within the clear rule our Supreme Court has reminded us to apply. In *Miceli*, union members refused to perform overtime work. 549 A.2d at 114. The employer argued that refusal changed the status quo because employees had voluntarily worked overtime in the past. *Id.* at 117. Our Supreme Court rejected that argument, observing that for the employees' refusal of overtime to constitute a change to the status quo, "it must be shown that required overtime work was part of the pre-existing terms and conditions of employment under the expired bargaining agreements." *Id.* at 118. The *Miceli* court held that the fact of prior voluntary overtime work did not ensconce mandatory overtime into the status quo, because "[t]he expired agreements provide for voluntary overtime work which the individual employees were free to accept or

11

decline." The express terms of the agreement simply were the status quo, and they did not include mandatory overtime. *Id.*

In *Behers*, the employer changed the work schedules of employees. 842 A.2d at 367. The union argued—and this Court held—that the employer had altered the status quo by upending its long-settled practices regarding employee hours. Our high court reversed and reaffirmed *Miceli*'s clear rule. It held that because the CBA expressly authorized employer to "(1) set starting and quitting times for its employees; (2) make individual shift assignments; and (3) establish and change schedules," the employer's changes to work hours were expressly authorized by the CBA and were thus not a change to the lawful status quo. *Id.* The *Behers* court reversed this Court's reliance on the employer's past practice because that practice was "not memorialized in the parties' written agreement." *Id.* It warned that we should not look to past practice to divine an unwritten status quo, as that would "eviscerate the clear and simple rule articulated in *Miceli*." *Id.* In *Behers*, like in *Miceli*, the express terms of the agreement simply were the status quo, regardless of past practice contrary to those terms.

Having been so warned, we must decline ATI's invitation to "restrict [*Miceli* and *Behers*] through curtailed readings of" those controlling decisions. *Behers*, 842 A.2d at 367. Here, looking to the express terms of the CBA and the Plan Document it incorporates—which are the only agreements we have on the topic—we see nothing memorialized regarding a practice of restricting Plan loans to employees who are receiving pay at the time they request the loan. The CBA generally provides for the Plan, and the Plan Document authorizes employees to obtain loans against their 401(k) accounts. The Plan Document imposes some express limitations on loan eligibility: the loan balance must be of a certain amount,

12

it must satisfy a certain ratio with the employee's 401(k) account balance, and the employee is limited to no more than three loans. Nothing "memorialized in the parties' written agreements" states that receiving income is a requirement for loan eligibility. *Behers*.

Mr. Brown's testimony about the "plan procedures" does not change this. The Plan procedures have apparently not been reduced to a writing, or if some of them have been, it is only in a "working document" that was neither produced nor introduced. Not only were those partly written procedures not memorialized in the CBA or the Plan Document, but they were also not known to employees or the Union, so they cannot have formed part of the parties' agreements.[9] *Behers*' clear rule leaves no room for an extra-record jurisprudence of notes. We must look only at the agreements themselves, and they do not speak to the asserted practice or procedure. If employers wish to rely on such procedures, they must, under *Behers*, be fully negotiated and memorialized in the parties' written *agreements*, which entails that they are known to both parties. The procedures ATI invokes here were not, so we cannot rely on them as part of the status quo. The same is true of the Plan Administrator's discretion. That discretion is only to "construe, interpret and apply" the Plan Document's terms, not to supplement them with procedures unknown to employees and the Union. C.R. at 1413. We reject ATI's suggestion that the Plan Administrator's contractual discretion somehow makes any after-adopted policy part of the agreement, which would totally circumvent our Supreme Court's Section 402(d) decisions. We must conclude, then, that ATI's practice of denying loans to

---

[9] ATI conceded at oral argument that the alleged plan procedures were never provided to employees or the Union. To say the least, the Court is troubled by the contention that unwritten or at best written-but-not-disclosed rules may be applied by a Plan Administrator who contends to have absolute, final and unfettered discretion.

13

unpaid employees is not part of the status quo.

Finally, we address ATI's argument that the Board erred in rejecting Mr. Brown's testimony as not credible. ATI argues that the Board's credibility determination was not supported by substantial evidence. This slightly misstates the inquiry. As our Supreme Court has previously observed, this argument really "does not involve a question of substantial evidence," but rather is a challenge to the Board's exercise of its power to substitute its own credibility determinations for the Referee's, even when the Board has not directly observed the testimony at issue. *Peak v. Unemployment Comp. Bd. of Rev.*, 501 A.2d 1383, 1388 (Pa. 1985). The Board has exactly that power, as long as its decisions are "subject to judicial review on the substantial evidence test and [the Board is] required to explain its decision in sufficient detail to permit meaningful appellate review." *Id.* at 1389. Thus, we review the *entire decision* under the substantial evidence test, but we review the Board's credibility determination only for adequacy of explanation. *See Office of Atty. Gen. v. Unemployment Comp. Bd. of Rev.*, 533 A.2d 1087, 1089 (Pa. Cmwlth. 1987) (citing *Peak*).

Here, the Board rejected a portion of Mr. Brown's testimony— regarding the established practice or policy of denying Plan loans to unpaid workers—as not credible, even though it was uncontradicted, which it was free to do. *Russo v. Unemployment Comp. Bd. of Rev.*, 13 A.3d 1000, 1003 (Pa. Cmwlth. 2010). The Board explained that decision by referencing the written agreements of record, which do not provide for that policy or practice explicitly. Thus, the Board explained its credibility determination sufficiently that we can review it. Indeed, we already have. As discussed *supra*, Mr. Brown's testimony regarding ATI's Plan procedures does not overcome the absence of those practices from the express

14

written agreements, which must be our focus. We conclude that the Board did not err in its credibility determination.

For the foregoing reasons, we hold that Claimants are not ineligible for UC benefits under Section 402(d) of the UC Law because, for the time periods that the Board addressed, the work stoppage resulted from ATI's having altered the status quo by refusing 401(k) loans to Claimants. We thus affirm the decision of the Board.

_____
MATTHEW S. WOLF, Judge

Judge Fizzano Cannon did not participate in this decision.

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ATI Flat Rolled Products LLC, | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | Nos. 226-230 C.D. 2024 |
| | : | & |
| Unemployment Compensation | : | 232-252 C.D. 2024 |
| Board of Review, | : | |
| Respondent | : | |
| | | |
| Allegheny Technologies Incorporated, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 231 C.D. 2024 |
| | : | |
| Unemployment Compensation | : | |
| Board of Review, | : | |
| Respondent | : | |

## **O R D E R**

AND NOW, this 6th day of March 2025, the determinations of the Unemployment Compensation Board of Review mailed February 1, 2024, in the above-captioned matters are AFFIRMED.

_____
MATTHEW S. WOLF, Judge